# IN THE COURT OF APPEALS OF IOWA

No. 18-0337
Filed March 20, 2019

IN RE THE MARRIAGE OF COLETTE DENISE FRIEST
AND BRENT TODD FRIEST

Upon the Petition of
COLETTE DENISE FRIEST,
        Petitioner-Appellant/Cross-Appellee,

And Concerning
BRENT TODD FRIEST,
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Hardin County, Timothy J. Finn,

Judge.

        Colette Friest appeals and Brent Friest cross-appeals various provisions of

the district court's decree dissolving their twenty-one-year marriage. **AFFIRMED**

**AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**

        Kodi A. Brotherson of Becker & Brotherson Law Office, Sac City, and Leslie

Babich of Babich Goldman, P.C., Des Moines, for appellant.

        Anjela A. Shutts and Van T. Everett of Whitfield & Eddy, P.L.C., Des

Moines, for appellee.

        Heard by Doyle, P.J., and Mullins and McDonald, JJ.  Decided by Vogel,

C.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

Colette Friest appeals and Brent Friest cross-appeals various provisions of the district court's decree dissolving their twenty-one-year marriage. Upon our review, we affirm the district court's decree as modified and remand with instructions.

### I. Background Facts and Proceedings.

Brett and Colette Friest were both born in 1973. They received Bachelor of Science degrees from Iowa State University in 1995. They married in August 1996 and have four minor children—the oldest born in 2001 and the youngest in 2008. One of the children has intellectual disabilities and other serious health issues; the child generally requires supervision and is unlikely to be capable of independent living in the future. Colette anticipated that child would live with her and she would care for the child as long as she is able to do so.

The parties' income throughout their marriage has been generated mostly from their employment with Friest Farms Ltd., a family-farm corporation owned primarily by Brent's parents. Friest Farms farrows to finish approximately 5000 pigs a year and also has a 2500 head custom contract finish hog site. Additionally, Friest Farms has about 400 acres of farm ground and pays Brent and his father custom farming lease payments to farm the ground.

Brent oversaw the hog operation and was paid an annual salary by Friest Farms. He testified he was also paid by Friest Farms to custom farm Friest Farms

ground.[1]  In addition to his work for Friest Farms, Brent had a personal farming operation.  He cash rented and farmed approximately 500 acres of row crops, corn, and soybeans with 10 acres of alfalfa, and his income from that work fluctuated year-to-year, as farm work tends to do.

Colette also worked for Friest Farms.  Before the children were born, Colette worked full-time for the business, helping take care of the pigs, doing sow records, and doing field work.  She also helped Brent doing field work on their own farming operation.  After the birth of their first child, Colette started cutting back her hours, and she became an hourly employee of Friest Farms.  She continued working for the business until 2015.  She has since been caring for the children and going to massage-therapy school.  She anticipated she would complete the school program in 2018.  Colette and Brent agreed Colette had no actual income at the time of trial.

The parties' marital home and the land upon which it is situated is owned by Friest Farms.  The parties lived in the home rent free, and Friest Farms paid most of the expenses related to the home, including real estate taxes, insurance, utilities, and repair costs.  The business also paid for Brent and the eldest child's cell phone service and supplied the family with beef and pork.  Friest Farms provided the family with health and dental insurance.

Colette filed her petition for dissolution of marriage in February 2016.  She requested she and Brent be granted joint legal custody of the children; that she be granted physical care of the children; and that Brent be granted visitation rights.

---

[1] The record is a bit confusing on this point.  In some parts of the record this income is referred to as farm-machinery rental income.  In its statement of facts, the district court stated, "Brent owns farm equipment that he leases to Friest Farms."

Colette requested awards of child support and spousal support. The parties entered into a stipulated agreement concerning custody and visitation of the children prior to trial.

Following a trial, the district court entered its decree. Based upon Colette's past earnings, her age, her health, and her education, the court determined Colette was capable of earning $31,707 per year in income and used that figure in determining child support. The court accepted Brent's expert's opinion as to Brent's personal farming income, and the court determined Brent's total annual income for purposes of child support was $94,578. Applying these earnings to the child support guidelines, and including a 20% credit for extraordinary visitation, the court determined Brent's monthly child support obligation for the four children was $1425, with the support obligation decreasing after each child reaches the age of majority. The court also determined Colette was entitled to lifetime spousal support starting at $500 per month, increasing when the child support award decreased, to a total of $1000 per month until either Colette or Brent died or Colette remarried.

The court then distributed the parties' property. The court ordered Brent to pay Colette $75,452 to equalize the overall distribution, with $37,726 to be paid on or before December 31, 2017 and $37,726 to be paid on or before December 31, 2018. The court ordered Brent be responsible for the first $250 of any non-insured or deductible medical or dental expenses, not covered by insurance per child per year, then, once that deductible was met, Colette would be responsible for 28% and Brent 72% of uncovered medical costs.

Both Colette and Brent filed posttrial motions to amend or enlarge the

district court's decree. *See* Iowa R. Civ. P. 1.904(2). The court denied both motions.

Colette now appeals, and Brent cross-appeals.

## II. Discussion.

Both Colette and Brent take issue with the court's division of property, as well as the spousal-support award. Concerning the latter, Colette argues the amount of the award was insufficient, and Brent argues the award should be reduced to a term of years. Colette also challenges the amount of the child-support award, asserting the court should have determined Brent's annual income was greater than the amount it found. Additionally, both Colette and Brent appeal with respect to the children's health insurance coverage and deductible, the children's life insurance policies, and the parties' own life insurance policies. Our review is de novo. *See* Iowa R. App. P. 6.907; *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). We examine the entire record and determine anew the issues properly presented. *In re Marriage of Rhinehart*, 704 N.W.2d 677, 680 (Iowa 2005). We give weight to the factual findings of the district court, but are not bound by them. *In re Marriage of Geil*, 509 N.W.2d 738, 741 (Iowa 1993).

The trial court noted "[t]his is an extremely complicated case." In view of the 3709-page trial-court binder,[2] and the issues raised by the parties, we wholeheartedly agree with the trial court.

## A. Child Support.

We begin with Colette's argument concerning child support. "In Iowa, child

---

[2] The trial court binder, created especially for the appellate courts, is an electronic version of the entire district court record.

support is calculated using the child support guidelines." *In re Marriage of Erpelding*, 917 N.W.2d 235, 245 (Iowa 2018); *see also* Iowa Code § 598.21B(1) (2016); Iowa Ct. R. 9.2. "The purpose of the guidelines is to provide for the best interests of the children by recognizing the duty of both parents to provide adequate support for their children in proportion to their respective incomes." Iowa Ct. R. 9.3(1). Moreover, there is "a rebuttable presumption that the amount of child support which would result from the application of the guidelines prescribed by the supreme court is the correct amount of child support to be awarded." Iowa Code § 598.21B(2)(c).

"To compute the guideline amount of child support," the district court must first compute the adjusted net monthly income of each parent. Iowa Ct. R. 9.14. That amount is determined by first determining each parent's gross monthly income. *See* Iowa Ct. R. 9.14(1). Under the guidelines, "'gross monthly income' means reasonably expected income from all sources." Iowa Ct. R. 9.5(1).

In addressing the issue of Brent's income for setting child support, the district court observed:

> A main issue during this trial was what the court should use as Brent's income, particularly from his personal farming operation, for setting his child-support obligation. In prior years, Brent farmed approximately 703.5 acres. Currently, Brent will only farm a total of 510.9 acres. Brent testified during trial that while he has searched for additional acres to farm, . . . he has been unsuccessful in locating additional acres. Based upon the decrease in the number of acres he is farming and the decrease in current crop prices, . . . [it is estimated] that Brent will break even for the 2017 crop year.
> Brent has experienced big fluctuations in his farming income. For example, in 2011, Brent's gross farming income was $335,929. In 2013, the gross farming income was $663,537. In 2016, Brent's gross farming income dropped to $444,462. Brent testified that he borrowed no money to operate his farm in 2015. In contrast, at the end of 2016, his operating note had a balance of over $250,000.

The farm economy in the state of Iowa is in a downturn and is not really expected to improve in the near future. [Brent's] expert . . . testified that the comparison of cost of production to average crop prices . . . continues to show the dramatic decline in farm income in Iowa. [One of Brent's exhibits], a list of average grain prices in the state going back to 1925, demonstrates that the highest prices per bushel ever of corn in the state of Iowa occurred in 2011, 2012, and 2013, when it was $7.13 per bushel for corn, which is what Colette urges the Court to use in determining Brent's income. Since that time, the average price per bushel of corn has dropped to less than $4 per bushel in the last three calendar years.

The district court relied upon Brent's expert's opinion as to determining Brent's personal-farming operation income. Brent's expert's report states:

At face value, the tax returns illustrate that Brent's income has gone down over the past three years, and the three-year average of adjusted straight-line income before taxes is $35,778 . . . . We have chosen a three-year average after a closer analysis based on historical grain prices demonstrat[ing] that grain prices were at historical highs from 2011 through late 2013 and do not reflect the current market of [Brent's] current earning capacity. Prospects for any significant improvement in the agricultural economy in the near future appears to be limited.

Averaging the adjusted-net-income figures for years 2014 through 2016, the expert opined Brent's personal farming income, after adjustments for depreciation, was $35,778 annually.[3] Adding that amount to Brent's salary from Friest Farms and his custom farming/"rental" income from Friest Farms, the expert opined Brent's total annual income was $94,578.[4]

Colette takes issue with this calculation. She argues the court "failed to normalize Brent's income by adding back the expenses for Colette's wages and the employee benefit program that had been deducted in arriving at taxable income

---

[3] $83,208 (2014) + $19,508 (2015) + $4619 (2016) = $107,335 ÷ 3 = $35,778
[4] $40,800 (salary from Friest Farms) + $18,000 (custom farming/machinery rents from Friest Farms) + $35,778 = $94,578.

from the farming operation on Schedule F of the parties' 2014 through 2016 income tax returns." She asserts that because Brent will not be paying her "a wage going forward and because Brent will no longer be able to deduct these 'Employee Benefits,' the costs, like the adjustment from accelerated depreciation to straight-line depreciation, should be added back to Brent's income for child support and alimony purposes."

Brent's expert opined the amounts Colette sought to add back in for the employee benefit program were used for medical expenses primarily and were therefore not disposable cash flow that could just be added in. We agree. But, we think the "labor hired" item is a different matter. Colette was paid $15,000 in 2014, $12,000 in 2015, and nothing in 2016. That was disposable cash benefiting the family and is not an expense Brent will incur in the future. We think it should be added back into Brent's personal farming income for purposes of calculating child support. Adding the labor hired amounts back into Brent's personal farming net income, using Brent's expert's figures, results in adjusted net income of $98,208 in 2014, $31,508 in 2015, and $4619 (no change) in 2016. The resulting three year average adjusted net income for Brent's personal farming operation is $44,778.[5] After a careful review of the record, we believe Brent could be "reasonably expected" to earn as his personal farm income for purposes of calculating Brent's child support award $44,778 annually. Accordingly, we must remand the issue back to the district court to recalculate Brent's child support obligation.

---

[5] $98,208 + $31,508 + $4619 = $134,335 ÷ 3 = $44,778.

### B. Children's Health Insurance.

### 1. Provision Thereof.

The parties agreed Brent would provide health insurance for the parties' children, and they asked the court to include that agreement in its decree. However, the district court did not. Upon our de novo review, we modify the decree to require Brent to provide health insurance for the parties' children.

### 2. Deductible and Additional Costs.

Additionally, Brent argues the district court erred in ordering Brent be responsible for the first $250 per year per child in uncovered medical expenses. Colette asserts that Brent failed to preserve the issue for our review. We disagree.

Here, Brent pointed out in his rule 1.904(2) motion that the district court failed to decree he was responsible for provision of the children's health insurance and that the court ordered him to pay "the first $250 per year, per child, up to $800 of expenses not covered by insurance." The district court declined to modify or amend its decree thereafter, even as to inclusion of Brent's responsibility for the insurance. We find the issue was minimally raised to preserve error.

It is true Iowa Court Rule 9.12(5) states "the custodial parent shall pay the first $250 per year per child of uncovered medical expenses up to a maximum of $800 per year for all children," and the word "shall" generally imposes a duty. *See* Iowa Code § 4.1(30). However, rule 9.13 permits the district court to deviate from the guidelines where it is justified and appropriate. Nevertheless, the district court must state its reasons for permitting the variance. *See* Iowa Ct. R. 9.13.

Here, the district court did not state its reasons for permitting the variance. On our de novo review, we do not believe deviation from rule 9.12(5) is justified or

appropriate.  Therefore, we modify the decree to conform to rule 9.12(5).

### C. Children's Life Insurance.

Brent and Colette agree the district court should have included in its decree a provision requiring Brent to maintain the children's life insurance policies. However, Brent states his agreement was premised on him having control of the policies "so he could provide periodic statements to Colette regarding the policies." He requests that if we agree to modify the decree to order that he is responsible for maintaining the children's life insurance policies, we should also "award Brent control of all four policies."  Unsurprising, Colette asks that we not grant Brent control of the policies.  Alternatively, she requests we include language requiring her express agreement to change the policies.

Upon our review, we find the decree should be modified to require Brent to "maintain the children's life insurance policies and shall provide to Colette statements each year by January 30th," the relief Brent requested at trial.  Brent shall have control over the policies but cannot make any changes to the policies without Colette's approval.

### D. Spousal Support.

The district court ordered Brent to pay Colette spousal support of $500 per month while he is paying child support for four children, $650 per month when Brent is paying child support for three children, $750 per month when he is paying child support for two children, $900 per month "when there is one or fewer children that he is required to pay child support for," and $1000 per month when he is no longer required to pay child support.  Colette argues, "[a]t a minimum, the district court should have ordered Brent to pay Colette a combination of rehabilitative and

traditional alimony of $2000 per month until Brent dies, Colette dies, or Colette remarries." Brent does not quibble with the amount of the decree's award; rather, he asserts the support award should be reduced to a term of years.

"Whether spousal support is justified is dependent on the facts of each case." *In re Marriage of Shanks*, 805 N.W.2d 175, 178 (Iowa Ct. App. 2011). Though not mandated, the district court may order spousal support be paid if it determines support payments are warranted after considering all of the following factors together:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> . . . .
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1); *see also In re Marriage of Gust*, 858 N.W.2d 402, 407-08 (Iowa 2015); *Shanks*, 805 N.W.2d at 178. The trial court is "in the best position to balance the parties' needs, and [appellate courts] should intervene . . . only where there is a failure to do equity." *Gust*, 858 N.W.2d at 416.

Upon our de novo review of the record, and considering all of the relevant

section 598.21A(1) factors discussed above, including the parties' lengthy marriage and Brent's higher earning capacity, we conclude the district court's spousal support award is both compatible with the requirements of section 598.21A(1) and equitable. *See In re Marriage of Mauer*, 874 N.W.2d 103, 110 (Iowa 2016) ("[W]hen application of the factors contained in section 598.21A(1) results in a spousal support calculation inconsistent with a calculation under any guidelines-based approach, the calculation determined by application of the statutory factors must prevail because the guidelines have not been adopted or sanctioned by our legislature.").

In this case, the court awarded Colette traditional spousal support. The court typically awards traditional spousal support in "long-term marriages where life patterns have largely been set and the earning potential of both spouses can be predicted with some reliability." *In re Marriage of Kurtt*, 561 N.W.2d 385, 388 (Iowa Ct. App. 1997). The purpose of traditional spousal support "is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued" and "is ordinarily of unlimited or indefinite duration." *Gust*, 858 N.W.2d at 408 (quoting *In re Marriage of Hettinga*, 574 N.W.2d 920, 922 (Iowa Ct. App. 1997)).

Here, the length of the marriage, nearly twenty-one years, meets the "durational threshold [to] merit serious consideration for traditional spousal support." *Id.* at 411. Both parties are educated. With "marriages of relatively long duration, '[t]he imposition and length of an award of traditional alimony is primarily predicated on need and ability.'" *Gust*, 858 N.W.2d at 411 (quoting *In re Marriage of Wendell*, 581 N.W.2d 197, 201 (Iowa Ct. App. 1998)). The measurement "for

determining need has been the ability of a spouse to become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Id.* (quoting Iowa Code § 598.21A(1)(f)).  To determine need, "we focus on the earning capability of the spouses, not necessarily on actual income."  *Id.*

This is a lengthy marriage and Colette is leaving the marriage with a lower earning capacity and earning history.  Conversely, Brent will continue to receive income from his parents' farm and all of the perks he has previously received as their employee that was not calculated into his income, such as free rent and utilities.  Upon our de novo review, we find the amount of the spousal support award is equitable.

With respect to duration, "an award of traditional spousal support is normally payable until the death of either party, the payee's remarriage, or until the dependent spouse is capable of self-support at the lifestyle to which the party was accustomed during the marriage.  *Gust*, 858 N.W.2d at 412.  "In order to limit or end traditional support, the evidence must establish that the payee spouse has the capacity to close the gap between income and need or show that it is fair to require him or her alone to bear the remaining gap between income and reasonable needs."  *Id.*  At the time of trial both parties were 44 years of age.  Based upon standard mortality tables, Brent had a life expectancy of 34.61 years and Colette 38.23 years.  Brent's spousal support obligation is therefore potentially very lengthy—but there is a safety valve.  "Termination of spousal support may be appropriate when 'the record shows that a payee spouse has or will at some point reach a position where self-support at a standard of living comparable to that enjoyed in the marriage is attainable.'"  *Mauer*, 874 N.W.2d at 111 (quoting *Gust*,

858 N.W.2d at 412). Upon our de novo review, we find the duration of the spousal support award to be consistent with our jurisprudence.

Colette asserts the district court should have required Brent to maintain a life insurance policy to secure his alimony obligation. That type of provision is enforceable. *See In re Marriage of Debler,* 459 N.W.2d 267, 270 (Iowa 1990) (requiring payor to list payee as beneficiary on life insurance policy as long as his alimony obligation continues). However, this court has stated, "such a requirement should be imposed only when the cost is known or can be reasonably estimated and the cost is neither unduly burdensome nor out of proportion to the benefits of providing such security." *In re Marriage of Weber,* No. 98-1688, 2000 WL 278535, at *10 (Iowa Ct. App. Mar. 15, 2000) (discussing *Debler,* 457 N.W.2d at 270). Colette did not reasonably estimate or ascertain the cost of the $200,000 policy, and we were not reasonably able to find such a cost in our review of the massive record. Without that information, we decline Colette's request that Brent maintain life insurance to secure his spousal-support obligation. Consequently, we affirm the district court on the spousal-support issue.

### E. Parties' Life Insurance Policies.

Colette and Brent agree the life insurance policies awarded by the district court should be reallocated as follows:

| Pacific Life #1400    (from W to H) | H | Cash value $25,983 |
| Accordia Life #5440 (from W to H) | H | Cash value $14,722 |
| Pacific Life #1410    (from H to W) | W | Cash value $16,349 |
| Accordia Life #5450 (from H to W) | W | Cash value $15,034 |

We agree and modify the decree to reflect these changes. Because of the difference in the cash value of the awards, we also increase Colette's property

settlement award by $4661.

### F. Property Distribution.

Both parties challenge aspects of the district court's distribution of the parties' property and resulting equalization payment calculation. Colette argues the court failed to include or incorrectly valued certain marital assets and, factoring these amounts in to the distribution calculation, her equalization payment should be increased from $75,452 to $361,029. Brent argues the court should have set aside his and Colette's shares of Friest Farms from the calculation because the shares were gifts from his parents.

Iowa Code section 598.21(5) requires marital property be divided equitably in dissolution-of-marriage cases. *See also In re Marriage of Hansen*, 733 N.W.2d 683, 702 (Iowa 2007). This first requires a determination of which property is subject to division, and then, considering the factors set forth in section 598.21(5), that property must be divided equitably. *See Fennelly*, 737 N.W.2d at 102.

In determining which property is subject to division, "the district court looks for all marital assets that exist at the time of the divorce, with the exception of gifts and inheritances to one spouse." *In re Marriage of McDermott*, 827 N.W.2d 671, 678 (Iowa 2013); *see also* Iowa Code § 598.21(6). Nevertheless, the court can include gifts and inheritances in the property division if the court finds it would be inequitable to the other party or their children not to include the property. *See McDermott*, 827 N.W.2d at 679; *see also* Iowa Code § 598.21(6).

"Valuation is difficult and trial courts are given considerable leeway in resolving disputes as to valuations." *Shanks*, 805 N.W.2d at 177. "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible

evidence." *Hansen*, 733 N.W.2d at 703. Even though our review is de novo, we generally "defer to the trial court when valuations are accompanied by supporting credibility findings or corroborating evidence." *Id.* Yet, because our review is de novo, we may make our own findings and conclusions on issues properly raised but not decided by the district court. *See Lessenger v. Lessenger*, 156 N.W.2d 845, 846 (Iowa 1968) (noting our review of an equity case is de novo where we may issue fact findings and legal conclusions on our own review as we deem proper). Stated another way, because our review is de novo, we need not ascertain the intent of the district court but conduct our own "review of the statutory factors relevant to an equitable distribution of marital property." *Rhinehart*, 704 N.W.2d at 683. We note that the owner of the property is considered "a competent witness to testify to its market value." *Hansen*, 733 N.W.2d at 703. Additionally, while we recognize that generally the value of the assets should be determined as of the date of trial, there may be occasions when the trial date is not appropriate to determine values. *See In re Marriage of Driscoll*, 563 N.W.2d 640, 642 (Iowa Ct. App. 1997). This is because equitable distributions require flexibility and concrete rules of distribution may frustrate the court's goal of obtaining equitable results. *See id.*

On our de novo review, we have considered the applicable section 598.21(5) factors in this case, including but not limited to the length of the parties' marriage, as well as each party's age, health, earning capacity, premarital property, contribution to the marriage and to the other's increased earning power, and other economic circumstances. For the following reasons, we modify the court's property division as follows:

### 1. *Farm Loan/Prepaid Inputs & Future Expenses.*

Colette maintains the court's inclusion of the $190,000 farm operating note as a debt in Brent's column without offsetting it with "part of the assets purchased with that debt (i.e. the prepaid inputs), is patently inequitable." Brent listed prepaid expenses for the 2017 crop year as $220,339. The district court did not include this asset in its property division calculations. Brent ultimately suggests to leave the court's distribution as is, arguing the court's exclusion of the prepaid expenses and future 2017 crop expenses[6] was reasonable since the district court ordered him "to pay spousal support based, in part, upon his farming income" and to include the pre-paid expenses would "essentially be double dipping."

We agree with Colette that inclusion of the operating loan in the property division without including the prepaid inputs as assets is inequitable. Brent himself listed the prepaid expenses as an asset in his statement of requested relief. So, we modify the decree by including the prepaid inputs in the amount of $220,339 in the asset column of the property division. Therefore, we increase Colette's property settlement award by $110,170.

### 2. *Equipment and Machinery Valuation.*

Colette asserts the district court erred in various valuations of marital machinery and equipment awarded to Brent. The court valued the machinery and equipment at $230,000, broken down as follows: equipment—$206,200; add-on

---

[6] Brent estimated he would incur some $153,000 in expenses in the future for the 2017 crop year. These expenses were for not yet incurred crop rent payments, crop insurance, fuel, and repairs. These expenses were not included in the district court's property division. Because we do not consider these future expenses to be an asset or liability for property-division purposes, we likewise do not include the expenses in the property division.

system to equipment—$12,000; and four grain bins—$11,800. Collette argues the court should have valued the grain bins at $55,954, and the following should have been added: cattle barn—$8250; horse shed—$3291; a fifth grain bin—$2460; bin sensors—$1190; corn dryer—$35,201; tiling—$22,500; and dryer bin repairs—$22,892. She totals the value of the machinery and equipment at $369,892.

Several items for which the district court did not include had value. Specifically, Brent testified the corn dryer was valued at $25,000. Additionally, Brent testified the he believed the cattle barn was worth $5000 to $6000. He assumed the horse shed was worth 50% of new, which Colette suggests is $2194.

As to the grain bins, Colette states the parties paid more than $74,000 to construct bins on a third party's property. Brent's appraiser found the four bins were worth a total of $11,800 because they are on located on land not owned by Brent or Colette and value would be lost in relocation costs. Conversely, Colette testified marital funds were expended on the bins with the understanding that at some point in the future Brent would inherit the land upon which the four bins are located. Colette's expert, though not an appraiser of machinery, opined the total value of the bins (including the fifth bin) was $58,414.[7] We conclude the district court's value of the four bins is within the range of permissible evidence. We value the fifth bin at $1640. We agree with the district court that it was not appropriate to include the remaining items, the bin sensors, tiling and dryer bin repairs. We therefore modify the machinery and equipment valuations by adding to Brent's asset column $25,000 for the corn dryer; $5000 for the cattle barn; $2194 for the

---

[7] Colette asserts the parties spent $3280 on the fifth bin and requests it be valued at $2460 (75% of the original cost).

horse shed; and $1640 for the fifth grain bin. Therefore, Colette's property award is increased by $16,917.

### 3. Dunwith LLC.

The district court found Dunwith LLC had no value except for the value of Brent's equipment. We find the valuation to be within the permissible range of evidence.

### 4. Shares of Friest Farms.

As of 2013, Brent's parents had given Brent 400 shares and Colette 50 shares of the 4237 shares of Friest Farms. Both Brent and Colette agree Colette's shares should be exchanged for money. The shares' valuation is at issue, as well as how the shares should be exchanged. First, however, Brent argues the shares were gifts and should not have been included in the equitable-division calculation. We disagree.

Though the district court did not make any express finding, it is clear the court believed inclusion of the shares in the division was necessary to equitably divide the parties' assets. There is no marital home here. Moreover, the evidence indicates the first 50 shares Brent received in 2008 was "as compensation from Friest Farms." Ultimately, we find to exclude the shares from the property division would be inequitable, and we therefore affirm the district court's inclusion of the shares in its property division.

The district court found value of a share of Friest Farms' stock was $596.06. The court reasoned that the business was valued at $3,607,855, and, with 4237 shares, the cost of each share would equate to $852.52 per share. However, the district court agreed with Brent's expert that a 30% discount should be applied to

account "for lack of marketability and lack of control," lowering the value of a share to $596.06.

A closely-held corporation's stock's valuation "can rarely be ascertained," and we give the district court much leeway in making such valuations *In re Marriage of Keener*, 728 N.W.2d 188, 194 (Iowa 2007). Brent points to two cases where the court affirmed on appeal application of marketability discounts, finding the trial court's valuation within the range of permissible evidence. *See In re Marriage of Wiedemann*, 402 N.W.2d 744, 746 (Iowa 1987) (affirming 20% discount); *In re Marriage of Steele*, 502 N.W.2d 18, 21 (Iowa Ct. App. 1993) (affirming 40% discount). Brent's expert opined a marketability discount should apply. The expert stated such discounts can range anywhere from 10% to 35%. He went on to explain that, because the share must be based upon the fair market value, discounts would always be included in the value. Because of "lack of marketability and lack of control," the expert applied a 30% discount to the share's value.

Upon our review, we find no reason to disturb the district court's share valuation, as the valuation is clearly within the range of permissible evidence. We therefore affirm the valuation.

### G. Appellate Attorney Fees.

Finally, Colette requests appellate attorney fees Appellate attorney fees are discretionary, not a matter of right, and we consider the requesting party's need, the ability of the other party to pay, as well as the appeal's relative merits in deciding whether to award such fees. *See McDermott*, 827 N.W.2d at 687. Here, both parties advanced successful and unsuccessful claims. Considering the

relevant factors, we decline Colette's request for appellate attorney fees in this appeal.

### III. Conclusion.

We believe Brent could be "reasonably expected" to earn $44,778 annually as his personal farm income for purposes of calculating his child support obligation. Accordingly, we must remand the issue back to the district court to recalculate Brent's child support obligation. We modify the decree to require Brent to provide health insurance for the parties' children. Regarding uncovered medical expenses, we modify the decree to conform to rule 9.12(5). The decree is modified to require Brent to maintain the children's life insurance policies and to provide to Colette statements each year by January 30. Brent shall have control over the policies but cannot make any changes to the policies without Colette's approval. We affirm the district court's award of spousal support. We modify the decree to reflect our changes to the award of the parties' life insurance policies, and because of the difference in the cash value of the award from the district court's award, we increase Colette's property settlement award by $4661. We increase Colette's property settlement award by $110,170 to take into account the addition of prepaid inputs to the Brent's asset column. We increase Colette's property settlement award by $16,917 to take into account the addition of the corn dryer, cattle barn, horse shed, and grain bins to Brent's asset column. Thus, we increase the equalization payment in total to Colette by $131,748. To be clear, this amount is in addition to the equalization payment amount provided for in the decree. On remand, the district court shall order a schedule of payments for the increased equalization payment that is fair and equitable to the parties.

We affirm the decree in all other respects.  Any costs on appeal shall be assessed equally to the parties.  We do not retain jurisdiction.

**AFFIRMED AS MODIFIED AND REMANDED WITH INSTRUCTIONS.**